UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

vs.

JAMES SNOW
  a/k/a "TANK,"

             Defendant.

Criminal No. 24-cr-10121

## GOVERNMENT'S SENTENCING MEMORANDUM

The government submits the instant memorandum in support of its recommendation for 108 months of incarceration for James Snow, a/k/a "Tank," the defendant. This recommendation reflects the seriousness of the offense, and is sufficient but no greater than necessary to accomplish the goals of sentencing.

Investigators recovered numerous items from controlled purchases with the defendant during their investigation into him, including over 800 grams of methamphetamine he distributed directly during recordings, along with four firearms, two of which had been reported stolen.

Addressing the defendant's history and his conduct here, following his request for release from detention, Magistrate Judge Kelley summarizes it well:

> Mr. Snow, 34 years old, is charged with two counts of conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine and selling firearms without a license. The government has strong evidence that he was involved in twelve sales of methamphetamine to an undercover officer and dealt with the officer directly on eight occasions, selling both drugs and four firearms and ammunition to the officer. The government ultimately recovered almost ten pounds of methamphetamine in this case...
>
> … At the time of the alleged offenses here, Mr. Snow was on probation out of the Malden District Court for larceny. He previously was found in violation of his probation in another case where he was ordered not to associate with a motorcycle gang but did so anyway. The government alleges that he still has strong ties to what it refers to as "an outlaw motorcycle gang."

Dkt. # 70, Order of Detention at 3 (Kelley, M.J.) [1]

In the instant case, beginning in the Fall of 2023, the defendant and his co-conspirators – several of which were members and associates of the Unknown Bikers Motorcycle Club ("UBMC") – engaged in the sale of approximately 10 pounds of methamphetamine, seized by law enforcement officers who conducted over twenty controlled purchases of narcotics, largely crystal methamphetamine, and four guns.  After the drug buys in this case, law enforcement arrested the co-conspirators, including the defendant's arrest in September of 2024. During that arrest, law enforcement officers recovered a cell phone from the defendant, where a subsequent cell phone extraction revealed further evidence of drug distribution transactions.

A 108-month sentence in this matter would communicate a clear message to the defendant, that society has laws that he simply must follow.  The defendant is not merely a drug and gun trafficker. He is not merely an outlaw motorcycle gang member.  And he is not merely an individual who willingly, and repeatedly, disregards the terms of his probation and pre-trial conditions of release.  Instead, he is every one of these things.  Not just because I say so, but because he has earned these characterizations during his life of crime.

On September 18, 2024, the defendant was arrested and charged in several counts of a superseding indictment, including for conspiracy to distribute and to possess with intent to distribute 50 grams and more of methamphetamine, in violation of 21 U.S.C. § 846 (Count Two); possession with intent to distribute 50 grams and more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(a)(viii) (Count Four); and engaging in the business of

---

[1] *See also* Dkt. # 69, Government's Opposition to Defendant's Request for Release from Detention; which (along with 17 submitted exhibits including Snow's communications with the undercover officer, photographs from controlled purchases, phone toll analysis and his prior convictions) outline a summary of the background of the investigation; the conduct in this case; as well as a summary of the defendant's criminal history and gang associations.

dealing in firearms without a license in violation of 18 U.S.C. § 922(a)(1)(A).  On December 1, 2025, the defendant pleaded guilty to so much of Count Two of the Superseding Indictment as alleges conspiracy to distribute and to possess with intent to distribute 5 grams and more of methamphetamine, in violation of 21 U.S.C. § 846; so much of Count Four as alleges possession with intent to distribute, and distribution of, 5 grams and more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii); and to Count Five, which alleges that he engaging in the business of dealing in firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A).

The Pre-Sentence Investigation Report ("PSR") calculates the defendant's Guidelines Sentencing Range ("GSR") as 151-188 months (12 years, 6 months to 15 years, 8 months) imprisonment. There is also mandatory-minimum term of 60 months incarceration. In the binding "(C)" plea agreement, the parties agreed to a range of incarceration of 87-108 months. For the reasons set forth below, the government recommends a sentence of 9 years (108 months) in prison, to be followed by 5 years of supervised release.

## I.    THE ADVISORY SENTENCING GUIDELINES

The PSR issued by U.S. Probation determined that the defendant was accountable for at least 500 grams, but less than 1.5 kilograms of "ice" methamphetamine drug weight, resulting in an offense level of 34. See PSR at ¶43.  The offense level was increased by two levels because dangerous weapons were possessed. See PSR at ¶44.  Pursuant to the plea agreement, the defendant is also responsible for being a prohibited person in possession of four firearms, including at least one that was stolen, and that he transferred a firearm or ammunition with the reason to believe that it would be used in connection with another felony offense. See USSG §§ 2K2.1(a)(6), 2K2.1(b)(1)(A), 2K2.1(b)(4)(A), and 2K2.1(b)(6)(B)).  The offense level was reduced three levels for defendant's timely acceptance of responsibility under USSG § 3E1.1.

See PSR at ¶¶50, 51. The defendant has several prior criminal convictions, resulting in two criminal history points. PSR ¶ 57. Accordingly, his total offense level is 33 and his criminal history category is II. See PSR at ¶107.  The PSR lists defendant's advisory GSR as 151-188 months' imprisonment, see PSR at ¶107, with a 5-year mandatory minimum.  See PSR at ¶106. The government agrees with the PSR's calculation of the GSR.

## II.       SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

The factors set forth in 18 U.S.C. § 3553(a) assist the Court in determining a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in § 3553(a)(2). These factors include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence for criminal conduct, to protect the public from further crimes of the defendant, and to provide for the needs of the defendant. They also require courts to consider the kinds of sentences available, and the GSR.

Consideration of the § 3553(a) factors demonstrates that a sentence of 108 months, followed by 5 years of supervised release, is the appropriate sentence in this case.

### a.  __Nature of the Offense__

The nature and circumstances of the defendant's drug and gun trafficking justify a significant sentence of 108 months.  In analyzing the defendant's conduct and eventual arrest, the Court should first consider the brazen nature of the defendant's drug and gun trafficking, while already on probation in state court, along with the rest of his significant criminal history (including numerous convictions, default warrants, violations of probation, and a concerning

history of firearms and outlaw motorcycle club gang association). Despite all this, he actively participated and involved himself in this large-scale methamphetamine distribution conspiracy.

i.   Background

The defendant's arrest was a result of a joint federal, state and local investigation, dubbed "Operation Crystal Road" that commenced in 2023, with the objective of disrupting the trafficking of large amounts of methamphetamine in the eastern Massachusetts area by members and associates of the Unknown Bikers Motorcycle Club ("UBMC"). During the course of this investigation, law enforcement officers conducted over twenty controlled purchases of narcotics, largely crystal methamphetamine, and guns, during recorded deals that occurred with regularity in eastern Massachusetts. Investigators made additional seizures, and ultimately recovered approximately 10 pounds of crystal methamphetamine, along with four firearms.

Under the ATF's direction, an ATF cooperating witness ("CW-1") and an undercover law enforcement officer ("UC-1") made a series of controlled purchases, which were largely recorded, from the defendant, as well as Daniel LOUGHMAN a/k/a "SWISS" ("LOUGHMAN"), Danielle STEENBRUGGEN a/k/a "DANIELLA" (STEENBRUGGEN), and James ADAMS a/k/a "JIMMY" ("ADAMS"), four individuals connected and known to one another through LOUGHMAN in the trafficking of large amounts of methamphetamine in the eastern Massachusetts area. Investigators learned that this was a supplier-based drug conspiracy, where the defendant and ADAMS both worked as sellers for LOUGHMAN, and STEENBRUGGEN was later introduced to CW-1 as an individual who managed the distribution operation for LOUGHMAN and also conducted sales alongside ADAMS. See PSR at ¶¶ 9 - 11.

ii.   The Defendant's Conduct in the Methamphetamine Conspiracy

As indicated in the statement of offense conduct, the defendant coordinated and participated in numerous controlled purchases with an undercover police officer ("UC-1"), who made repeated controlled buys of narcotics, and subsequently firearms, from the defendant.

During the controlled purchases, the defendant was involved in 12 of the sales, and dealt with the undercover officer directly on at least 8 occasions, including each time he sold firearms to the officer, and where he was repeatedly captured conducting the sales on covert recording devices. Notably, investigators learned that nearly all of the methamphetamine was "Ice," meaning a mixture or substance containing d-methamphetamine-hydrochloride of at least 80% purity.  During each controlled purchase that the defendant was involved in, except for the November 29th controlled purchase, the respective drug sale included more than 50 grams of ice methamphetamine.

Additionally, during communications with the undercover officer, the defendant made numerous statements about his involvement in illegal trafficking, such as "My shit is top quality clearly if people giving my name out like that…And I go by Tank I don't like using my legal name" as well as "And I didn't say anything because I don't rat…or say [names]" and "I straight up done bro. I got a wife and kid not about to 10+ [years]…This was my last chance with my family, not risking it" during texts surrounding the October 5th controlled purchase, the *first* of a dozen drug and gun deals involving the defendant.  *See* Government Detention Exhibit 14.

Additionally during this investigation, the defendant attempted to conceal himself and evade law enforcement in numerous ways, including changing his phone number on at least 3 occasions. Up until the first occasion, in December 2023, the defendant had been using a -4723 phone number. However, in December, 2023 the defendant sent a text message to the undercover

officer stating "Yo, it's Tank's new number," during further texts surrounding the December 7th controlled purchase of over 100 grams of methamphetamine, after which additional controlled purchases were completed. *See* Government Detention Exhibit 8. Investigators utilized toll records during this time period, as well as the data from cell site location information and an active pen register, to determine that the defendant was utilizing a telephone app that was "spoofing" his phone number and causing the display to show a phone number (a -1633 phone number) different from that of the telephone from which the call or text was actually placed.

Moreover, during this investigation, the defendant showed no signs of slowing down. Even after the final controlled purchase in March, 2024, the defendant continued to change his phone number and continue to engage in drug & gun trafficking discussions with the undercover officer.  Leading up to the day that the defendant was arrested, September 27, 2024, investigators had to utilize further cell phone records, as well as the data from cell site location information, to ascertain that the defendant was living in New Hampshire at an address not registered to him. As recent as the night before the defendant was arrested, investigators learned that Snow was traveling back and forth between Massachusetts and New Hampshire, including in the middle of the night, and that when he was residing overnight in New Hampshire, it also appeared he was turning his cell phone off for significant periods of time.

Each part of this conduct demonstrates the seriousness of the defendant's offenses, based on the period of time in which he engaged in this activity, the defendant's readiness to sell more, and his desire to further his drug trafficking business.

Methamphetamine is a deadly and highly addictive drug that is an increasingly serious problem throughout the United States and in the District of Massachusetts.[2] The proportion of federal drug trafficking cases involving methamphetamine has steadily increased over the past 20 years, accounting for 48.7% of all of drug trafficking cases in 2022, and becoming the predominant drug trafficked over the last decade.[3] Abuse of this potent stimulant is plaguing many parts of the country, and the government has seen a significant rise in the amount of methamphetamine in the District of Massachusetts over the course of the last four years.

Recent national reports have confirmed that methamphetamine abuse is increasing dramatically. The National Institute on Drug Abuse found that among people aged 12 or older in 2021, 0.9% (or about 2.5 million people) reported using methamphetamine within the prior 12 months,[4] and that reflects only those who reported use. Moreover, methamphetamine is one of the most commonly misused stimulant drugs in the world.[5] "The consequences of methamphetamine misuse are terrible for the individual—psychologically, medically, and socially. Using the drug can cause memory loss, aggression, psychotic behavior, damage to the cardiovascular system, malnutrition, and severe dental problems." [6] In addition to these horrific

---

[2] Martha Bebinger, *"Meth Use Is Rising In Boston, Intensifying The Opioid Crisis,"* appearing at https://www.wbur.org/news/2018/11/21/meth-worsening-opioid-epidemic (last updated December 04, 2018).

[3] United States Sentencing Commission, *Methamphetamine Trafficking Offenses in the Federal Criminal Justice System,* appearing at https://www.ussc.gov/sites/default/files/pdf/research-andpublications/research-publications/2024/202406_Methamphetamine.pdf, at 16 (last viewed August 6, 2024) ("USSC 2024 Methamphetamine Trafficking Offenses")

[4] See NIDA. "Overview." *National Institute on Drug Abuse*, 24 Feb. 2023, https://nida.nih.gov/publications/research-reports/methamphetamine/overview (last updated November of 2024).

[5] Id.

[6] Id.

effects on individual health, "methamphetamine misuse threatens whole communities, causing new waves of crime, unemployment, child neglect or abuse, and other social ills." [7]

Among people aged 12 and older in 2020, an estimated 0.6% (or about 1.5 million people) had a methamphetamine use disorder in the prior 12 months. [8] Methamphetamine is second only to fentanyl in causing drug-related deaths in the United States.[9] In 2022, there were 33,355 methamphetamine-related deaths nationwide.[10]  Indeed, this crisis has worsened each year since 2015. [11] The Centers for Disease Control and Prevention found that overdose deaths from psychostimulants, comprising mostly methamphetamine, increased by 703% from 2011 to 2021.[12] Moreover, the Drug Enforcement Administration found that 31% of drug-related deaths in the United States are caused by psychostimulants – mostly methamphetamine.[13] As of June 2, 2024, there were at 34,595 methamphetamine-related deaths nationwide for the prior 12-month period. [14]

---

[7] Id.

[8] Id.

[9] Drug Enforcement Administration, *2024 National Drug Threat Assessment*, appearing at https://www.dea.gov/sites/default/files/2024-05/5.23.2024%20NDTA-updated.pdf, at 3 (last viewed July 17, 2025) ("DEA 2024 Assessment").

[10] National Center for Health Statistics, *VSRR Provisional Drug Overdose Death Counts*, appearing at https://data.cdc.gov/d/xkb8-kh2a (hereinafter, "2022 VSRR Overdose Death Counts") (last updated July 16, 2025).

[11] Id.

[12] USSC 2024 Methamphetamine Trafficking Offenses, at 6.

[13] DEA 2024 Assessment, at 6.

[14] National Center for Health Statistics, *National Vital Statistics System, Provisional Drug Overdose Death Counts,* appearing at https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm (last accessed June 24, 2024) (hereinafter, "2024 VSRR Overdose Death Counts").

Equally devastating, as methamphetamine production has shifted from makeshift, local labs to sophisticated Mexican laboratories, methamphetamine production and purity have increased exponentially.[15] Purity of methamphetamine has risen to nearly 100%. Indeed, in this case, investigators seized approximately 10 pounds of methamphetamine, almost all of which was at least 93% pure methamphetamine. As the New York Times has reported, this combination of increased production and increased purity has been particularly lethal: "There is more meth on the streets today, more people are using it, and more of them are dying." [16]

In recent years, methamphetamine has become much more prevalent in the Northeast.[17] Most of the methamphetamine supply is produced in Mexico and transported to the United States.[18] That is because methamphetamine produced in Mexico presents a lower cost, higher purity, and higher potency alternative.[19] Due to its low costs of production and maintenance, combined with the expansion of Mexican drug cartels into major United States cities and their extensive drug distribution networks within local communities, methamphetamine remains in constant supply and is easily accessible.[20] Purer, cheaper methamphetamine leads to more

---

[15] Frances Robles, "*Meth, the Forgotten Killer, is Back. And It's Everywhere*", The New York Times, February 13, 2018, appearing at https://www.nytimes.com/2018/02/13/us/meth-crystal-drug.html (hereinafter, "Frances Robles, *Meth, the Forgotten Killer, is Back. And It's Everywhere*") (last updated February 13, 2018).

[16] Frances Robles, *Meth, the Forgotten Killer, is Back. And It's Everywhere*.

[17] U.S. Department of Justice Drug Enforcement Administration, *2020 National Drug Threat Assessment*, available at https://www.dea.gov/sites/default/files/2021-02/DIR-008-21%202020%20National%20Drug%20Threat%20Assessment_WEB.pdf, at 23 (last viewed July 17, 2025) (hereinafter, "DEA 2020 Assessment"); Streck, Joanna M et al., *Injection of Methamphetamine Has Increased in Boston, Massachusetts: 5 Waves of Centers for Disease Control and Prevention State Surveillance Data*, 17.3 J. OF ADDICTION MEDICINE 349–352 (2023) (last viewed July 12, 2023).

[18] DEA 2024 Assessment, at 31.

[19] Id.

[20] Id. at 3 – 16.

deaths. The number of methamphetamine overdoses in Massachusetts alone increased threefold from 2018 to 2022 (growing from 70 deaths to 210).[21]  Between June 2023 and June 2024, there were 215 methamphetamine-related overdose deaths in Massachusetts.[22]  In fact, "[t]he rate of all drug-related E[mergency] D[epartment] visits was highe[r] among patients residing in the Northeast[ern United States] (2,531 per 100,000 [residents])" than any other region in the nation.[23]

Even when not lethal, the physical and emotional effects of methamphetamine abuse are dramatic. Methamphetamine has a horrific impact on its users and on the community. Methamphetamine is a tremendously addictive drug, which can cause dramatic physical and emotional changes on those who use it, including increases in aggressive and violent behavior.[24] The physical effects on users are well-documented. The emotional changes are equally devastating:

> Chronic abusers may exhibit symptoms that can include significant anxiety, confusion, insomnia, mood disturbances, and violent behavior. They also may display a number of psychotic features, including paranoia, visual and auditory hallucinations, and delusions (for example, the sensation of insects creeping under the skin). Psychotic symptoms can sometimes last for months or years after a person has quit abusing methamphetamine, and stress has been shown to

---

[21] 2022 VSRR Overdose Death Counts.

[22] 2024 VSRR Overdose Death Counts.

[23] Substance Abuse and Mental Health Services Administration, PEP22-07-03-002, *Findings from Drug-Related Emergency Department Visits, 2021*, https://store.samhsa.gov/sites/default/files/pep22-07-03-002.pdf (2022), at 9 (last viewed July 17, 2025).

[24] Mark A. R. Kleiman, Jonathan P. Caulkins, and Angela Hawken, *Drugs and Drug Policy: What Everyone Needs to Know* 120 (Oxford University Press 2011) ("There is . . . a much stronger association between violence and regular methamphetamine use. Heavy use of methamphetamine increases the likelihood of attack behaviors and aggression, with the most compelling evidence coming from laboratory studies involving mice.").

precipitate spontaneous recurrence of methamphetamine psychosis in formerly psychotic methamphetamine abusers.[25]

Unlike opioid addiction, there are no approved drugs available for treatment of methamphetamine addiction.[26] Addicted users who choose to stop using methamphetamine may face withdrawal symptoms including severe depression, psychosis, and intense drug cravings.[27] Even methamphetamine addicts who manage to overcome their addiction "will be at risk for relapse for years and possibly for their whole lives."[28]

The defendant's actions have been a direct contributing factor in the ongoing drug crisis in Massachusetts.  The fact that he continued to be involved in drug dealing, recognizing his exposure for his involvement in communications with the undercover officer and then escalating the weight of his drug dealing and also introducing firearms for sale - and while still having pending state probation for a felony offense at the time of his gun and drug trafficking conduct - demonstrates that a significant sentence is necessary to promote respect for the law and to provide just punishment and deterrence in this case.

---

[25] National Institute on Drug Abuse, *What are the long-term effects of methamphetamine abuse,* April 7, 2017, appearing at https://www.drugabuse.gov/publications/researchreports/methamphetamine/what-are-long-term-effects-methamphetamine-abuse (last accessed June 24, 2024).

[26]  Carmen Heredia Rodriguez, *"Meth's Resurgence Spotlights Lack of Meds To Combat the Addiction,"* Kaiser Health News, January 14, 2019, appearing at https://khn.org/news/meths-resurgencespotlights-lack-of-meds-to-combat-the-addiction/ (last viewed June 24, 2024).

[27] National Institute on Drug Abuse, *Methamphetamine Drug Facts*, May 16, 2019, appearing at https://nida.nih.gov/publications/drugfacts/methamphetamine (last accessed June 24, 2024).

[28] National Institute on Drug Abuse, *Understanding Drug Use and Addiction Drug Facts*, June 6, 2018, appearing at https://nida.nih.gov/publications/drugfacts/understanding-drug-use-addiction (last viewed July 17, 2025).

### iii.   The Defendant's Conduct in Gun Trafficking

The nature and circumstances of the defendant's firearm trafficking also justifies a significant sentence of incarceration.  During this investigation, in the span of less than a month, SNOW sold four separate firearms and dozens of rounds of ammunition to UC-1, including on at least one occasion along with over 100 grams of methamphetamine. Investigators also learned that the firearm sold on February 14, 2024 was reported stolen in Manchester, NH in July of 2020, and that one of the firearms sold on February 21, 2024 was reported stolen on February 23, 2024 from a storage unit, two days *after* the defendant completed the sale to UC-1.

The threat of guns in modern society is well documented and grows more serious every day. Less well understood, but no less significant, is the fact that the harm caused by the defendant's criminal activity may not be felt for many years to come. This is because the data shows that the average time from the purchase of a new gun to the recovery of the gun at a crime scene ("time to crime") in Massachusetts is *8.06 years*.[29]   This data mean that illegal guns trafficked, like those supplied by the defendant, will likely be used in the hands of criminals for the better part of the next decade.

Simply by involving a firearm, crimes across the country become much greater in seriousness and harm. Data show that states with more guns have more deaths. [30] Available research demonstrates that the involvement of guns makes quarrels, robberies, domestic disputes, and other conflicts deadlier. Those engaged in violent crime in the United States are not more

---

[29] *See ATF Firearms Trace Data for 2023*, available at: https://www.atf.gov/resource-center/firearms-trace-data-massachusetts-2023. The Massachusetts data was not an aberration, as the national average was 6.76 years.  *Id.*

[30] German Lopez, VOX, *America's unique gun violence problem, explained in 16 maps and charts*, (August 16, 2021), available at: https://www.vox.com/policy-and-politics/2017/10/2/16399418/america-mass-shooting-gun-violence-statistics-charts

intent on killing compared to their counterparts in other nations, they merely have better access to powerful tools that make death a more likely outcome of an assault or conflict. [31]  As a result, America has seven times as many firearm homicides as Canada, and nearly 19 times as many as France. [32] The rate of murder or manslaughter by firearm is the highest in the developed world. There were approximately 20,958 deaths as a result of a homicide involving a firearm in 2021. That is approximately 80.5% of all homicides for the year. [33]

More to the point of this investigation, most gang-related murders and felonies involve illegal guns, according to federal crime data. [34] Illegal guns circulating among high-risk networks present a threat to the security and well-being of urban neighborhoods. The supply of illegal guns to those embedded in high-risk networks is a critical mechanism in shaping rates of deadly violence in American cities.[35] The negative impact of guns on society goes beyond death and disability. When an individual is victimized by or exposed to gun violence, it increases the likelihood that they will be victimized again or resort to gun violence themselves. [36] Gun homicides also can have severe economic consequences on communities. Residents of communities impacted by gun

---

[31] David M. Hureau & Anthony A. Braga, *The Trade in Tools: The Market for Illicit Guns in High-Risk Networks*, CRIMINOLOGY, volume 56 issue 3, (July 18, 2018), available at: https://onlinelibrary.wiley.com/doi/full/10.1111/1745-9125.12187

[32] Katherine Leach-Kemon, Rebecca Sirull & Scott Glenn, *On gun violence, the United States is an outlier*, INSTITUTE FOR HEALTH METRICS AND EVALUATION, (October 31, 2023), available at: https://www.healthdata.org/news-events/insights-blog/acting-data/gun-violence-united-states-outlier
[33] America's gun culture in charts, BBC NEWS, (December 7, 2023), available at: https://www.bbc.com/news/world-us-canada-41488081

[34] *Gun Violence in America*, NATIONAL INSTITUTE OF JUSTICE, (February 26, 2019), available at: https://nij.ojp.gov/topics/articles/gun-violence-america

[35] *Supra* note 4.

[36] *A Nation of Survivors: The Toll of Gun Violence in America*, EVERYTOWN FOR GUN SAFETY, (Updated February 3, 2022), *available at*: https://everytownresearch.org/reports/nationofsurvivors/

violence experience lower property values, fewer business startups, and loss of jobs. [37] One study estimated that surges in gun homicides slowed home value appreciation by four percent relative to communities which did not experience a surge in violence. [38] There are further economic consequences to gunshot injuries, including the immediate hospital costs as well as the lifetime medical care costs including readmission(s) to the hospital and nursing care. Gun violence also financially burdens survivors by diminishing wages and productivity and often results in a mental or physical disability. One study estimates the overall societal cost for each gun-related assault at $1.2 million. [39]

The defendant's decisions in this case reveals that he is capable of extremely dangerous conduct. As referenced above, when given the opportunity of probation, the Defendant violates that probation repeatedly. While having pending cases, the Defendant decided to be involved in further firearm-related offenses, including while being amongst other motorcycle gang associates. Even after being given the opportunity of release on conditions and subsequent further probation for felony theft, the Defendant continued to commit new offenses, specifically tied to this drug distribution and gun trafficking investigation. He even made mention of his pending case and also his awareness of the punishment he faced for the drug and gun sales he was actively engaged in. This extensive criminal history is highlighted by his repeated issues with firearms, drug dealing, and his gang association. In sum, the defendant's conduct here created a significant danger to the community, from the selling of these firearms, some of which

---

[37] *Id.*

[38] *Id.*

[39] *Id.*

were stolen, in addition to the large weights of methamphetamine in sales he orchestrated.  All of these factors support the significant sentence recommended by the government.

### b.  Characteristics of the Defendant

The government acknowledges the prompt acceptance of responsibility by this defendant. However, several aspects of his background stand out.  The Defendant has a significant criminal history and also repeated attempts to evade law enforcement and prior violations of probation. Moreover, while on pre-trial release and probation for a felony theft, after additional recent arrests for firearm offenses, the defendant was selling large amounts of drugs, as well as four firearms and ammunition, over the course of a dozen or so recorded controlled purchases. The Defendant has multiple warrants and violations notices on his record, where he has failed to abide with the conditions of the court as described. The Defendant may attempt to downplay and ignore his criminal history, but it evidences a complete disregard for the legal system.

The defendant has several past arrests and convictions, including on a variety of offenses. Shortly before that incident, he was arrested twice in quick succession for firearm-related offenses, and the Defendant's criminal history has been ongoing and continuous for a large portion of his adult life. As outlined in several incidents amongst the Defendant's criminal history;

<u>Receiving Stolen Property (2350cr1531, Malden District Court)</u>

At the time of the defendant's conduct and subsequent arrest in this case, he was either on pre-trial conditions of release or state probation in the Malden District Court, docket 2350cr1531, where he was charged with larceny, receiving stolen property and vandalizing property for an incident on July 26, 2023. That case where the defendant was involved in a theft of a $7,200

16

landscaping trailer while staying at his co-defendant LOUGHMAN's home in Wakefield, ended in the defendant pleading guilty and he was placed on probation until May 7, 2025.

During this conduct, the defendant was caught on surveillance video, utilizing the same vehicle involved in numerous controlled buys in this investigation, stealing an expensive landscaping trailer. Despite being caught on video, the defendant lied repeatedly to police officers about his involvement, and he even later spoke openly about the incident with the undercover officer that he was selling drugs to.

<u>Improper Storage of a Firearm, Carrying a Firearm without a License</u>
<u>(1950cr0836, Malden District Court)</u>

On April 20, 2019, detectives with the Massachusetts State Police executed a search warrant on a clubhouse for the Pagan Motorcycle Club, during which they recovered 4 firearms, including 2 in close proximity to the defendant. The defendant told investigators that he was in charge when asked, and was working in what appeared to be an unlicensed cash bar inside the clubhouse. 2 of the loaded firearms were recovered in a trash barrel next to where the defendant was standing, and an additional loaded magazine was found in a backpack near the defendant and behind the bar as well. Ultimately, amongst the 20 individuals located inside the clubhouse, many of which investigators believed to be associated with outlaw motorcycle organizations, the defendant and two others, including an individual "JW," were arrested.

Ultimately, this matter was dismissed against the defendant, however his bail was revoked for a period of 60 days after he was arraigned, due to this arrest occurring while he had a separate offense, also involving firearms, already pending.

<u>Improper Storage of a Large Capacity Firearm (1811cr3375, Lowell District Court)</u>

The defendant was convicted in Lowell District Court for charges related to the improper storage of a large capacity firearm in Tewksbury on June 14, 2018. The Tewksbury Police

17

revoked the defendant's license to carry a firearm as a result of a Facebook post that the defendant had made the day prior, which read in-part;

> "…No idea where my life will be next week tomorrow or even 5 years. Complete shit show if you ask me. I think I need to step back from everything and everyone for a while and really slap myself in the face and wake the fuck up bcuz I'm seriously going to kill someone that has no right to die."

When the police department arrived at the defendant's residence, which he shared with his fiancé and their infant child, Snow admitted that he had created the Facebook post, and provided several firearms to the police, including one gun inside a GMC truck, which was owned and registered to the individual "JW" referenced above. Investigators recovered a loaded firearm in that truck, which was inside the defendant's leather vest affiliated with the Devil's Disciples motorcycle club. Equally concerning to law enforcement was that the 2nd recovered firearm did not match any firearm registered to the defendant, and the defendant's fiancé later had to call police back to the residence and turn over more firearms from a safe in the house, to which the defendant stated he was holding onto for a friend.

The defendant pled guilty in 2019 and was originally sentenced to a year of probation, including conditions that he not possess any weapons and not associate with any biker gangs or organizations. However, a couple months later, the defendant was issued a violation notice, and ultimately found in violation of that probation.

The sentencing in this case deserves to be treated differently than a simple "hand-to-hand" drug dealing or gun dealing case.  Along with the defendant's criminal history, the circumstances here justify the government's recommendation of a sentence that is significant but still below the guideline sentencing range determined by the U.S. Probation office – a sentence of 108 months of incarceration. This, and other arguments raised throughout this memorandum, reflect the government's position that this is a very serious case.

As summarized above, the defendant has convictions for various substantial crimes in his past.  Yet, the most significant sentence after a guilty finding has been a one-year period of probation, including even after violating his probation on several occasions, and when given numerous opportunities on prior offenses (see PSR at ¶¶ 55 - 62).  He has failed to learn anything from those experiences.  Accordingly, the defendant should be punished in a manner that communicates to him the seriousness of his criminal behavior.

### c.  **Specific and General Deterrence and Protection of the Public**

#### i.  The Need for Specific and General Deterrence

The Court should also consider deterring both the defendant and others.  See 18 U.S.C. § 3553(a)(2)(B) (the court may impose a sentence "to afford adequate deterrence to criminal conduct").

A significant sentence of imprisonment is warranted to deter others from becoming involved in any way, role, or capacity in the trafficking of guns or methamphetamine, as the dangers associated with these cannot be overstated. Individuals tempted to engage in gun and drug trafficking must understand that any involvement, no matter how minimal, will have immediate and serious consequences. Imprisonment is necessary to send a strong warning to others who might otherwise consider trafficking these dangerous drugs or weapons or assisting those who do.

The defendant has been arrested for serious felonies before, but he has clearly not gotten the message of compliance with society's laws from his prior jail terms.  This sentence needs to make that point unmistakably clear, that his conduct has consequences.

Considerations of specific deterrence also support the imposition of a sentence of 9 years. The defendant simply has not gotten the message despite repeated interventions from the courts.

The defendant's criminal history reflects serious convictions and probationary sentences, that have only resulted in more criminal conduct. In fact, the only effect these interventions had was to cause the defendant to be more brazen, associating with large-scale methamphetamine suppliers along with members and associates of an outlaw motorcycle club. At the time he began selling crystal meth and guns to the undercover officer cooperator in this case, he was less than a year removed from his most recent felony arrest, and he was either on conditions of release or probation for those pending state charges during the entirety of this investigation, as referenced above.

Without a doubt, the defendant has dealt with substance abuse issues, as outlined in the PSR. That does not give him the right to sell to others and hurt the community with these large amounts of crystal methamphetamine, or dangerous firearms for that matter. This Court should impose a significant term of imprisonment to deter this defendant from ever again engaging in drug or gun trafficking.

### ii.   The Need to Protect the Public

Lastly, and perhaps most importantly, this Court should consider the need to protect the public from the defendant. See 18 U.S.C. § 3553(a)(2)(C) (the court may impose a sentence to "protect the public from further crimes of the defendant"). The defendant's penchant for drug and gun dealing, coupled with his significant criminal history, provide a deadly combination that simply must be addressed by the Court's sentence. This could not be made more clearly than from the actions of the defendant himself, in which he clearly, and repeatedly, demonstrated the lengths he'd go to in furtherance of his drug and gun trafficking business.

### d.   **Supervised Release Conditions**

The government also requests a term of 60 months of supervised release. In addition to the standard conditions, the government requests that the Court impose the special conditions set

forth in the recommendations made by U.S. Probation, and below, including associational restrictions and curfew.

i.    Curfew and Associational Restrictions

The government requests that the Court impose a curfew from 9:00 p.m. to 6:00 a.m. for the first 15 months after the defendant is released from prison or any community corrections confinement (either under BOP or Court supervision).  See, e.g., "Maximum Impact: Targeting Supervision on Higher-Risk People, Places and Times," Pew Center for the States Public Policy Brief (March, 2009) (concluding that Probationers are "at the highest risk of re-arrest during the first few months of community supervision," that arrest rates after 15 months were substantially lowered, and thus recommendation that probation resources be "front-end loaded" to achieve maximum effect).  The government also suggests that the defendant's probation officer should be allowed to relax the curfew for work or school and that it be enforced by electronic monitoring.

Further, as outlined by the evidence in this case, along with being an admitted drug and gun trafficker, the Government would contend that the defendant is also a self-admitted long-time member of outlaw motorcycle organizations, associating with the Unknown Bikers Motorcycle Club ("UBMC"), as well as the Red Devils outlaw motorcycle organization ("OMO"), and the Pagans OMO in the past.  Additionally, during the period of supervised release, the defendant should be prohibited from contacting, or being in the company of his co-defendants (namely, LOUGHMAN, ADAMS, or STEENBRUGGEN) or other individuals who the government asserts are members, associates or affiliates of the UMBC, the Red Devils, and the Pagans, many of whom are convicted felons that the defendant is barred by the standard conditions of probation from contacting in any event.

ii.   Drug testing and Counseling

The defendant should be drug tested while on supervised release and should be given counseling if considered appropriate by Probation. See PSR at ¶¶ 85 - 93.

iii.   Vocational and Educational Training

The defendant has limited vocational skills.  The government believes that the Court should make a judicial recommendation that the defendant be provided with any available vocational training while in prison and that he take advantage of any such classes and/or training while on supervised release. See PSR at ¶¶ 94 - 97.

## III.   THE GOVERNMENT'S RECOMMENDATION

For the foregoing reasons, those contained in the PSR, and those to be presented at the sentencing hearing, the government requests the following sentence:

- a term of 108 months' imprisonment;

- a fine within the Guidelines, as calculated by the Court, unless the Court finds that the defendant is not able to pay a fine;

- a term of 60 months' supervised release with the conditions referenced above and recommended by probation; and

- a special assessment of $300.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:   /s/ John T. Dawley, Jr.
John T. Dawley, Jr.
Assistant United States Attorney

Dated: February 27, 2026

22

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing upon all counsel of record by electronic filing notice.

/s/ John T. Dawley, Jr.
Assistant U.S. Attorney

Dated: February 27, 2026